1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  CENTRAL DISTRICT OF CALIFORNIA

10

11  MAGUIRE PARTNERS – MASTER   )  Case No. **CV 06-07371-JFW(RZx)**
    INVESTMENTS, LLC, MAGUIRE   )
12  PARTNERS, INC., TAX MATTERS )  Related Case Nos.:
    PARTNERS, et al.,           )
13                              )  CV 06-7374-JFW (RZx)
                  Plaintiffs,   )  CV 06-7376-JFW (RZx)√
14                              )  CV 06-7377-JFW (RZx)
         v.                     )  CV 06-7380-JFW (RZx)
15                              )
    UNITED STATES OF AMERICA,   )  **AMENDED FINDINGS OF FACT AND**
16                              )  **CONCLUSIONS OF LAW**
                  Defendant.    )
17  _____ )

18

19

20       This action came on for a court trial on August 12, 13,

21  and 14, 2008.  Steven R. Mather and Lydia Turanchik of Kajan

22  Mather and Barish appeared for Plaintiffs Maguire Partners –

23  Master Investments LLC, Maguire Partners Inc., Thomas Master

24  Investments LP, Thomas Partners Inc., Tax Matters Partner,

25  Huntington/Fox Investments LP, Edward D. Fox, Jr., Thomas

26  Division Partnership LP, Thomas Investment Partners Ltd.,

27  (collectively "Plaintiffs").  Andrew Pribe, Rick Watson, and

28  Jonathan Sloat of the Office of the United States Attorney

1  appeared for Defendant United States of America

2  ("Defendant").  On September 22, 2008, the parties filed

3  their proposed Post-Trial Findings of Fact and Conclusions of

4  Law.  On October 6, 2008, the parties each filed their Post-

5  Trial Briefs and their marked copies of the opposing parties'

6  proposed Post-Trial Findings of Fact and Conclusions of Law.

7  After considering the evidence, briefs and argument of

8  counsel, the Court makes the following findings of fact and

9  conclusions of law:[1]

10  _____

11      [1]  The Court deferred ruling on the admissibility of
deposition testimony of Messrs. Mandel, Varellas and Nelson
12  offered by the government as well as certain trial exhibits
objected to by the parties in the Final Pre-Trial Exhibit
13  Stipulation filed August 5, 2008, pending further post-trial
submissions by the parties.  On October 6, 2008, the parties
14  filed Notices of Designated Deposition Testimony of Kenneth
Mandel, Lawrence Varellas, and Kurt Nelson, Plaintiffs'
15  Objections and Defendant's Response to Objections.

16      The Court has reviewed the objections to the proffered
deposition testimony and the objections to certain trial
17  exhibits in the Final Pre-Trial Stipulation filed August 5,
2008, and rules as follows:  The Court overrules the
18  objections to Exhibits 45, 52, 53, 54, 74, 81, 82, 85, 86,
88, 89, 90, 94, 95, 97, 100, 101, 102, 103, 105, 130, 131,
19  140, 141, 142, 143, 144, 145, 146, 151, 260 (a) - (v) and
those exhibits will be received into evidence as of the last
20  day of trial, which was August 14, 2008.  As to the
objections to the deposition testimony of Mr. Mandel, all of
21  the Plaintiffs' objections are overruled except for the
following objections which are sustained:  (1)  p. 35, lines
22  2 - 4.  As to the objections to the deposition testimony of
Mr. Varellas, all of Plaintiffs' objections are overruled
23  except the following which are sustained: (1) p. 47,  lines
1- 10 and 15 - 25; (2)  p. 48, lines 1 - 25; (3)  p. 54,
24  lines 1 - 25; (4)  p. 55, lines 1 - 8; and (5)  p. 87, lines
15 - 25.  As to the objections to the deposition testimony of
25  Mr. Nelson, all of Plaintiffs' objections are overruled.
Plaintiffs' objections to Defendant's attempt to introduce
26  documents through deposition excerpts which were not marked
by Defendant as trial exhibits are sustained.   Those
27  documents are inadmissible and will not be received into

28                                        (continued...)

# Findings of Fact[2]

I.   **Factual and Procedural Background**

　　A.   **The Principals and Their Entities**

　　　　1.   **James Thomas**

James Thomas, a real-estate investor and developer, is the trustee of the Lumbee Clan Trust, which is a partner in Thomas Investment Partners Ltd. ("TIP"), which, in turn, is a partner in Thomas Division Partnership LP ("TDP").  In 2001 through 2002, these various partnerships owned an interest in: the Library Tower in Los Angeles; the Gas Company Tower in Los Angeles; the Wells Fargo Center in Los Angeles; the MGM Plaza in Santa Monica; the Solana project in Dallas; and Commerce Square in Philadelphia.  These investments were highly leveraged with debt in the range of eighty to ninety percent of the value of the property.  Thomas's net worth in 2001 was approximately $200 million, with approximately twenty to thirty percent in cash or marketable securities/cash equivalents and the remainder in real estate holdings, including those identified above.

　　　　2.   **Edward Fox**

Edward Fox, a real-estate investor and developer, is the trustee of The Edward D. Fox, Jr. Family Trust dated February

---

[1](...continued)
evidence and have not been considered by the Court.

[2]   The Court has elected to issue its findings in narrative form.  Any finding of fact that constitutes a conclusion of law is also hereby adopted as a conclusion of law, and any conclusion of law that constitutes a finding of fact is also hereby adopted as a finding of fact.

14, 1990 (the "Fox Trust"), which is a partner in Huntington/Fox Investments LP ("HFI"), which, in turn, is a partner in both Maguire Partners – Master Investments LLC ("MP-MI") and Thomas Master Investments LP ("TMI").  In 2001 through 2002, these various partnerships owned an interest in: the Library Tower in Los Angeles; the Gas Company Tower in Los Angeles; the Wells Fargo Center in Los Angeles; the MGM Plaza in Santa Monica; the Solana project in Dallas; and Commerce Square in Philadelphia.  These investments were highly leveraged with the debt in the range of eighty to ninety percent of the value of the property.

In 2001, Fox also was a major investor in the publicly-held Center Trust REIT where he served as chairman of the board and chief executive officer.  The Media Center Shopping Mall in Burbank, California was one of the key assets owned by the Center Trust REIT.  In 2001, Fox also was a founder and owner of Commonwealth Partners, which was assembling a portfolio of commercial real estate projects in partnership with various California state pension funds.  Fox's net worth in 2001 was approximately $50 million.


**B.  The Transactions At Issue**

**1.  The Lumbee Clan Trust Transaction**

On December 20, 2001, the Lumbee Clan Trust and AIG entered into a transaction in which the Lumbee Clan Trust paid $1.5 million to AIG.  The source of the funds used to pay AIG was a distribution from TIP.  Thomas contends that the purpose of the transaction was to serve as a hedge

against potential loss in the value of his real-estate interests arising from the risk of terrorism after September 11, 2001.   Thomas also contends that the Lumbee Clan Trust paid $1.5 million for an opportunity to receive a net maximum of $38.4 million.   The potential payout from the transaction was tied to the value of a portfolio of twenty REIT stocks (the "REIT basket").

### a.   The Structure of the Transaction

In general, the transaction between the Lumbee Clan Trust and AIG consisted of a short option, a long option, and a promissory note.   On December 20, 2001, the Lumbee Clan Trust and AIG in order to implement the transaction did the following: (1) the Lumbee Clan Trust sold a short option to AIG for $100 million; (2) the Lumbee Clan Trust purchased a long option from AIG for $61,683,169; (3) the Lumbee Clan Trust purchased a promissory note from AIG for $39,816,831; and (4) the Lumbee Clan Trust pledged the proceeds from the long option and the promissory note to secure the short option.   The Lumbee Clan Trust's transaction costs amounted to $1.5 million.   The long and short options were Asian-style European options.[3]   The promissory note eliminated AIG's obligation to transfer funds to the Lumbee Clan Trust in the amount representing the difference between the price of the

-----

[3]   An Asian-style option is an option whose payoff depends on the average value of the underlying security or commodity over a specified period of time.   In this case, the Asian-style feature meant that the payout was dependent on the average value of the REIT basket from December 20, 2001, to March 19, 2002, as compared to the value of the REIT basket on December 19, 2001.   A European option is one that can only be exercised on a particular date.   In this case, the date was March 19, 2002.

short option and the price of the long option.  The strike
price of the short option was fifty percent of the value of
the REIT basket, or $100,021,176.  The strike price of the
long option was seventy percent of the value of the REIT
basket, or $140,029,647.

### b.  The Terms of the Transaction

The terms of the transaction provided that any payoff
depended on the average value of the REIT basket between
December 20, 2001, and March 19, 2002, as compared to the
value as of December 19, 2001.  If the average value of the
REIT basket between December 20, 2001, and March 19, 2002,
did not fall by greater than thirty percent as compared to
the value of the REIT basket on December 19, 2001, then the
Lumbee Clan Trust would receive no payout.  If the average
value of the REIT basket between December 20, 2001, and March
19,2002, fell more than thirty percent as compared to the
value of the REIT basket on December 19, 2001, then the
Lumbee Clan Trust would receive a cash payment that would
increase dollar-for-dollar with the reduction in the average
value of the REIT basket below seventy percent of the value
of the REIT basket on December 19, 2001, until a maximum
payout of $40,008,471 was reached.  This maximum payout would
be reached if the average value of the REIT portfolio fell by
fifty percent or more from its value of December 19, 2001.
However, the Lumbee Clan Trust would never be obligated to
pay out-of-pocket anything other than the $1.5 million
transaction costs paid to AIG on December 20, 2001, for the
transaction.

1                       c.    The Contributions to the Partnerships

2          On December 27, 2001, the Lumbee Clan Trust contributed

3     the transaction to TIP.  Specifically, the Lumbee Clan Trust

4     contributed the long option and the promissory note, and TIP

5     assumed the short option.  On December 27, 2001, TIP

6     contributed the transaction to TDP.  Specifically, TIP

7     contributed the long option and the promissory note, and TDP

8     assumed the short option.  These contributions of the assets

9     and assumptions of the short option were with the approval of

10    AIG.  After the contributions to the partnerships, AIG's

11    position in the short option remained secured by the pledge

12    of the long option and the promissory note.

13                       d.    The Performance of the REIT Basket and the

14                             Transaction

15         The value of the REIT basket did not decline by an

16    average of thirty percent for the period between December 20,

17    2001, and March 19, 2002, as compared to its value on

18    December 19, 2001.  Therefore, the transaction did not yield

19    a net payment to TDP.

20                       e.    The Tax Reporting by the Partnerships and

21                             the IRS Adjustments Related to the

22                             Transaction

23                          (i.)   Thomas Investment Partners

24         TIP reported on its 2001 Form 1065 that $101,500,000 had

25    been contributed in capital during the year and that this

26    amount constituted an asset of TIP.  TIP also reported on its

27    2001 Form 1065 that the Lumbee Clan Trust had increased its

28    capital in TIP by $101,500,000.  TIP also issued a K-1

(partner's share of income, credits, deductions, etc.) to the Lumbee Clan Trust for 2001 that reflected an increase in the Lumbee Clan Trust's capital account of $101,500,000 due to the contribution of the transaction.  TIP reported on its 2002 Form 1065 that it had interest income of $191,640 and it claimed deductions of $1,691,640.  TIP did not account for the short option on either the Form 1065 or the K-1s for 2001 and 2002.  For 2001, the IRS issued a notice of Final Partnership Adjustment ("FPAA") which adjusted downward the capital contributed to and assets of TIP by $101,500,000 and sought to adjust the outside basis of LCT by $101,500,000.  For 2002, the FPAA adjusted downward income by $191,640 and disallowed the deduction of $1,691,640.

(**ii.**)   **Thomas Division Partnership**

TDP reported on its 2001 Form 1065 that $101,500,000 had been contributed in capital during the year and that this amount constituted an asset of TDP.  TDP also reported on its 2001 Form 1065 that TIP had increased its capital in TDP by $101,500,000.  TDP also issued a K-1 to TIP for 2001 that reflected an increase in TIP's capital account of $101,500,000 due to the contribution of the transaction.  TDP reported on its 2002 Form 1065 that it had interest income of $191,640, and it claimed deductions of $1,691,640.  TDP did not account for the short option on either the Form 1065 or the K-1s for 2001 and 2002.  For 2001, the IRS issued an FPAA that adjusted downward the capital contributed to and assets of TDP by $101,500,000, and sought to adjust the outside basis of TIP by $101,500,000.  For 2002, the FPAA adjusted

downward income by $191,640, and disallowed the deduction of $1,691,640.

### 2.   The Fox Trust Transaction

On December 20, 2001, the Fox Trust and AIG entered into a transaction in which the Fox Trust paid $675,000 to AIG. Fox contends that the purpose of the transaction was to serve as a hedge against potential loss in the value of his real-estate interests arising from the risk of terrorism after September 11, 2001.  Fox also contends that the Fox Trust paid $675,000 for an opportunity to receive up to a net maximum of $17,242,574.  The potential payout from the transaction was tied to the value of a portfolio of twenty REIT stocks (the "REIT basket").  This was the identical basket that the Lumbee Clan Trust transaction used.

### a.   The Structure of the Transaction

In general, the transaction between the Fox Trust and AIG consisted of a short option, a long option, and a promissory note.  On December 20, 2001, the Fox Trust and AIG in order to implement the transaction did the following: (1) the Fox Trust sold a short option to AIG for $45 million; (2) the Fox Trust purchased a long option from AIG for $27,757,426; (3) the Fox Trust purchased a promissory note from AIG for $17,917,574; and (4) the Fox Trust pledged the proceeds from the long option and the promissory note to secure the short option.  The Fox Trust's transaction costs amounted to $675,000.  The options were Asian-style European options. The promissory note eliminated AIG's obligation to transfer funds to the Fox trust in an amount representing the

1   difference between the price of the short option and the

2   price of the long option.  The strike price of the short

3   option was fifty percent of the value of the REIT basket, or

4   $45,009,529.  The strike price of the long option was seventy

5   percent of the value of the REIT basket, or $63,013,341.

6                **b.   The Terms of the Transaction**

7        The terms of the transaction provided that any payoff

8   depended on the average value of the REIT basket between

9   December 20, 2001, and March 19, 2002, as compared to the

10  value as of December 19, 2001.  If the average value of the

11  REIT basket between December 20, 2001, and March 19, 2002,

12  did not fall by greater than thirty percent as compared to

13  the value of the REIT basket on December 19, 2001, then the

14  Fox Trust would receive no payout.  If the average value of

15  the REIT basket between December 20, 2001, and March 19,

16  2002, fell by more than thirty percent as compared to the

17  value of the REIT basket on December 19, 2001, then the Fox

18  Trust would receive a cash payment that would increase

19  dollar-for-dollar with the reduction in the average value of

20  the REIT basket below seventy percent of the value of the

21  REIT basket on December 19, 2001, until a maximum payout of

22  $18,003,812 was reached.  This maximum payout would be

23  reached if the average value of the REIT portfolio fell by

24  fifty percent or more from its value on December 19, 2001.

25  However, the Fox Trust would never be obligated to pay

26  out-of-pocket anything other than the $675,000 transaction

27  costs paid to AIG on December 20, 2001.

28

### c.   The Contributions to the Partnerships

On December 27, 2001, the Fox Trust contributed the transaction to HFI.  Specifically, the Fox Trust contributed the long option and the promissory note, and HFI assumed the short option.  On December 27, 2001, HFI contributed $34,749,083 of the transaction to MP-MI.  Specifically, HFI contributed seventy-six percent of the long option and the promissory note, and MP-MI assumed seventy-six percent of the short option.  HFI had no prior investment in MP-MI.  On December 27, 2001, HFI contributed $7,682,535 of the transaction to TMI.  Specifically, HFI contributed seventeen percent of the long option and the promissory note, and TMI assumed seventeen percent of the short option.  HFI had no prior investment in TMI.  On December 27, 2001, HFI contributed the remaining seven percent of the transaction to Manhattan Properties, LP[4], which assumed the remaining seven percent of the short option.  These contributions of the assets and assumptions of the short option were with the approval of AIG.  After the contributions to the partnerships, AIG's position in the short option remained secured by the pledge of the long option and the note.

### d.   The Performance of the REIT Basket and the Transaction

The value of the REIT basket did not decline by an average of thirty percent for the period between December 20, 2001, and March 19, 2002, as compared to its value on

---

[4]   The Manhattan Properties, L.P., transaction is not a part of this litigation.

December 19, 2001.  Therefore, the transaction did not yield a net payment to Fox.

### e. The Tax Reporting by the Partnerships and the IRS Adjustments Related to the Transaction

#### (i.) Huntington/Fox Investments

HFI reported its investment in MP-MI on its 2001 Form 1065 in the amount of $513,515.  HFI reported its investment in TMI on its 2001 Form 1065 in the amount of $113,519.  HFI reported on its 2002 Form 1065 deductions of $707,183 and income of $80,114 pertaining to the transaction.  HFI did not account for the short option on either the Form 1065 or the K-1s for 2001 and 2002.  For 2001, the IRS issued an FPAA that adjusted downward the capital contributed to and assets of HFI by $42,431,618, and sought to adjust outside basis of the Fox Trust by $42,431,618.  For 2002, the FPAA adjusted income downward by $80,114, and disallowed the deduction of $707,183.

#### (ii.) Maguire Partners-Master Investments

MP-MI reported on its 2001 Form 1065 that it had made a capital contribution of $34,749,083 during the year and that this amount constituted an asset of the partnership.  MP-MI also reported on its 2001 Form 1065 that HFI had increased its capital in MP-MI by $34,749,083.  MP-MI also issued a K-1 to HFI for 2001 that reflected an increase in the HFI's capital account of $34,749,083 due to the contribution of the transaction.  MP-MI reported on its 2002 Form 1065 that it had interest income of $65,609 and it claimed deductions of

$579,143 pertaining to the transaction.  It also reported
other investments of $34,235,549.  MP-MI did not account for
the short option on either the Form 1065 or the K-1s for 2001
and 2002.  For 2001, the IRS issued an FPAA that adjusted
downward the capital contributed to and assets of MP-MI by
$34,749,083 , and sought to adjust the outside basis of HFI
by $34,749,083.  For 2002, the FPAA adjusted downward income
by $65,609, and disallowed the deduction of $579,143.  The
IRS also adjusted the other investments downward by
$34,235,549.

(**iii.**)  **Thomas Master Investments**

TMI reported on its 2001 Form 1065 that it had made a
capital contribution of $7,682,535 during the year and that
this amount constituted an asset of TMI.  TMI also reported
on its 2001 From 1065 that HFI had increased its capital in
TMI by $7,682,535.  TMI also issued a K-1 to HFI for 2001
that reflected an increase in HFI's capital account of
$7,682,535 due to the contribution of the transaction.  TMI
reported on its 2002 Form 1065 that it had interest income of
$14,505, and it claimed deductions of $128,040 pertaining to
the transaction.  It also reported other investments of
$7,569,000.  TMI did not account for the short option on
either the Form 1065 or the K-1s for 2001 and 2002.  For
2001, the IRS issued an FPAA that adjusted downward the
capital contributed to and assets of TMI by $7,682,535, and
sought to adjust the outside basis of HFI by $7,682,535.  For
2002, the FPAA adjusted downward income by $14,505, and

1    disallowed the deduction of $128,040.  The IRS also adjusted

2    the other investments downward by $7,569,000.

3

4        **C.   Background Regarding the Transactions at Issue**

5             **1.  The Arthur Andersen Call-Option Spread**

6        The transactions that were entered into by the Lumbee

7    Clan Trust and AIG and the Fox Trust and AIG were designed by

8    Arthur Andersen and referred to internally by various names,

9    such as the "call-option spread", the "synthetic put" and

10   "asset-hedging."  The call-option spread consisted of two

11   call options – one long and one short – and a promissory

12   note.[5]  By using the call-option spread, a taxpayer would be

13   able to create a basis in an amount substantially greater

14   than the amount of money actually paid for the call-option

15   spread by taking the position that the transaction created a

16   "contingent" liability for purposes of I.R.C. § 752.  In

17   order to create basis and obtain the tax benefit, the

18   taxpayer was required to contribute the call-option to a

19   partnership.

20       The call-option spread was viewed by Arthur Andersen tax

21   partners as one of many-tax-avoidance techniques marketed by

22   Arthur Andersen.  In fact, from 1999 to 2001, Arthur Andersen

23   _____

24        [5]  Ken Mandel was a tax partner at Arthur Andersen who
     worked on "leading edge tax solutions for both high-net-worth
     clients and large public corporations."  Defendant contends
25   that Mandel developed the call-option spread, which is an
     allegation that Plaintiffs deny.  In any case, it is clear
26   from the evidence in this case that Mandel is familiar with
     the Arthur Andersen technique referred to as the call-option
27   spread.  In fact, Mandel described the call-option spread as
     suitable "for a handful of very large dollar, trust-client
28   transactions, where we excluded the participation from
     outside attorneys and other non Firm professionals."

arranged approximately ten call-option spread transactions, and in all but one of these transactions AIG was the counter-party.  The call-option spread was considered a "proven solution" by Arthur Andersen, which included techniques offered by Arthur Andersen to minimize taxes.  It is estimated that the call-option spread transactions generated about $14.7 million in fees for Arthur Andersen in fiscal years 2000 and 2001.

### 2. Thomas and Fox Learn About the Call-Option Spread

In 2001, Martin Griffiths, a tax partner in the Los Angeles office of Arthur Andersen, was the engagement partner and the main point of contact for Thomas and Fox.  In fact, Thomas, Fox, and another real estate investor, Robert Maguire, represented approximately one hundred percent of Griffiths's business.  Because Griffiths was familiar with the investment portfolios and tax needs of Thomas and Fox, he considered it his duty to investigate and determine if any of the "interesting planning ideas" presented to him by Arthur Andersen had any applicability to Thomas or Fox.  He testified that it was his job to bring Arthur Andersen's "industry expertise" to bear on Thomas and Fox's interests.

Sometime before September 11, 2001, Griffiths became aware of the call-option spread, and decided to investigate it for Thomas, Fox, and Maguire.  Before September 11, 2001, Griffiths contacted his fellow tax partner Mandel to learn more about the call-option spread.  After discussing the call-option spread with Mandel, Griffiths and Mandel met with

Thomas and, separately, with Fox on September 27, 2001.
During these meetings, Mandel explained to Thomas, a former
trial attorney with the I.R.S., and Fox the increased basis
that could result from the call-option spread, which Mandel
described as a hedge, if the options and note were
contributed to a partnership.  In the weeks after the
September 27, 2001 meetings, Griffiths continued to discuss
the call-option spread with Thomas and Fox, including
detailed discussions regarding the structure of the
transaction.

In December 2001, Paul Rutter, outside transactional
counsel to Thomas and Fox, met with Mandel to discuss the
transaction.  He also reviewed the transactional documents
prepared by Sullivan & Cromwell, counsel to AIG.  Rutter was
not an expert on options or hedging, and did not provide
business advice to Thomas or Fox regarding the transaction.
Instead, Rutter's representation was limited to reviewing the
documents prepared by AIG's counsel, which included the
contribution agreements by which the transaction would be
contributed to the partnerships.  Rutter testified that it
was his understanding "that they [AIG] were doing this
transaction with other people and had a pre-existing set of
documents they used[.]"

Rutter also testified that the decision to contribute the
transactions to Thomas and Fox's respective partnerships had
already been made by the time he became involved in the
transaction.  In fact, Thomas and Fox admitted that it was
always their intention to contribute the transactions to

1   their respective partnerships.  The partnership contributions
2   were always viewed by Thomas, Fox, Griffiths, and Rutter as
3   integral to the entire transaction.

4        On December 20, 2001, Thomas and Fox entered into the
5   call-option spread transactions, described above, with AIG.

6

7   **II.  Discussion**

8        **A.    The Lumbee Clan Trust Transaction And The Fox Trust**
9             **Transaction Lack Economic Substance.**

10       A taxpayer is not permitted to reap tax benefits from a
11  transaction that lacks economic substance.[6]  *Coltec*
12  *Industries, Inc. v. United States*, 454 F.3d 1340, 1352-55
13  (Fed. Cir. 2006) (discussing Supreme Court precedent invoking
14  economic substance since 1935).  As the Federal Circuit
15  explained in *Coltec*, the economic substance doctrine requires
16  "disregarding, for tax purposes, transactions that comply
17  with the literal terms of the tax code but lack economic
18  reality," and, thus, "prevent[s] taxpayers from subverting

19  ─────────────────

20       [6]  Defendant argues that Plaintiffs are not entitled to
    the increased basis created by the transactions at issue
21  under the economic substance doctrine, the substance-over-
    form doctrine, or the step-transaction doctrine.  As the
22  *Stobie Creek* court noted, "[t]hese doctrines vary in origin
    and somewhat in application, yet apply to the same analysis."
23  (citing *King Enters., Inc. v. United States*, 418 F.2d 511,
    516 n. 6 (1969) ("[C]ourts have enunciated a variety of
24  doctrines, such as step transaction, business purpose, and
    substance over form.  Although the various doctrines overlap
25  and it is not always clear in a particular case which one is
    most appropriate, their common premise is that the
26  substantive realities of a transaction determine its tax
    consequences."); and *H.J. Heinz Co. & Subsidiaries v. United*
27  *States*, 76 Fed.Cl. 570, 583-85 (2007) (discussing multiple
    formulations employed by courts to consider whether
28  transaction has economic substance or whether it is a
    "sham")).

the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit." *Id.* at 1352-54.

### 1.   Legal Standard for Economic Substance Analysis

To determine whether a transaction is merely an economic sham, the court must determine whether the transaction had any practical economic effect other than the creation of tax benefits. *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990); *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir. 1988). Therefore, the court must exam the objective economic substance of the transaction and the subjective business motivation of the taxpayer. *Sochin*, 843 F.2d at 354; *Casebeer*, 909 F.2d at 1363. However, the objective and subjective inquiries are not "discrete prongs of a rigid two-step analysis," but "are simply more precise factors to consider in the application of [the Ninth Circuit's] traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses." *Id.*

#### a.   The Objective Economic Substance Inquiry

Under the objective economic substance inquiry, the Court must determine "whether the transaction ha[s] economic substance beyond the creation of tax benefits." *Casebeer*, 909 F.2d at 1365 (*citing Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1549 (9th Cir. 1987). To do so, the court must analyze whether the "substance of the transaction reflects its form" and whether, objectively, "the

1  transaction was likely to produce economic benefits aside
2  from a tax deduction."  *Id.*

3      A transaction lacks objective economic substance where it
4  does not appreciably affect a taxpayer's beneficial interest
5  except to reduce his taxes.  *Knetsch v. United States*, 364
6  U.S. 361, 366 (1960); *ACM Partnership v. Commissioner*, 157
7  F.3d 231 248 (3d Cir. 1998).  For example, *de minimis*
8  economic effect – such as the accumulation of small amounts
9  of cash value in an annuity contract or the assumption of
10  marginal risks in a partnership arrangement – are
11  insufficient to create economic substance.  *Knetsch*, 364 U.S.
12  361, 365-66 (finding transaction involving leveraged
13  annuities to be economic sham because possible $1,000 cash
14  value of annuities at maturity was "relative pittance"
15  compared to purported value of annuities); *ASA Investerings
16  Partnership v. Commissioner*, 201 F.3d 505, 514 (D.C. Cir.
17  2000); *ACM*, 157 F.3d at 251-52.

18              **b.   The Subjective Business Purpose Inquiry**

19      The Court analyzes a taxpayer's subjective business
20  purpose by determining "whether the taxpayers have shown that
21  they had a business purpose for engaging in the transaction
22  other than tax avoidance."  *Casebeer*, 909 F.2d 1363-64.  This
23  analysis "often involves an examination of the subjective
24  factors that motivated a taxpayer to make the transaction at
25  issue," such as the experience of the taxpayer, the extent of
26  the taxpayer's investigation into a transaction, the extent
27  of any advisor's investigation into the deal, and the
28  taxpayer's trial testimony regarding their motivation for

1  entering into the transaction." *Bail Bonds*, 820 F.2d at
2  1549; *see, also, Casebeer*, 909 F.2d at 1364.
3      One factor that can be considered in analyzing a
4  taxpayer's subjective business purpose is whether the
5  taxpayer was acting like a prudent economic actor or contrary
6  to rational business interests in the transaction.  *See,*
7  *e.g., Gilman v. Comm'r*, 933 F.2d 143, 146-47 (2d Cir.1991)
8  (requiring taxpayer to demonstrate that prudent investor
9  could have concluded that "realistic potential for economic
10 profit" existed) (internal quotation marks omitted); *Rice's*
11 *Toyota World, Inc. v. Comm'r*, 752 F.2d 89, 91 (4th Cir.1985)
12 (equating lack of economic substance with finding that "no
13 reasonable possibility of a profit exists"); *Long Term*
14 *Capital*, 330 F.Supp.2d at 172 (finding that transaction
15 lacked economic substance because, "at the time the
16 transaction was entered into, a prudent investor would have
17 concluded that there was no chance to earn a non-tax based
18 profit return in excess of the costs of the transaction");
19 *Estate of Strober v. Comm'r*, 63 T.C.M. (CCH) 3158, 3160
20 (1992) ("We conclude that ... a prudent investor, relying
21 upon independently obtained appraisals and research, would
22 not have concluded that [the] transaction offered a
23 reasonable opportunity for economic gain exclusive of tax
24 benefits.").  Thus, as the Federal Circuit found in *Coltec,*
25 there must be an objective inquiry into economic reality that
26 would ask "'whether a reasonable possibility of profit from
27 the transaction existed,'" *Coltec*, 454 F.3d at 1356 (quoting
28 *Black & Decker*, 436 F.3d at 441), and "whether the

transaction has 'realistic financial benefit.'" *Id*. at 1356
n. 16 (quoting *Rothschild*, 407 F.2d at 411); *see, also, Jade
Trading,* 80 Fed. Cl. At 47-48 ("The inquiry is not whether
the [taxpayers] *believed* the Jade transaction was a real
investment capable of making a profit, but whether the Jade
transaction in fact objectively was a real investment capable
of making a profit and altering their financial positions.").
In addition, where a taxpayer is sophisticated in economics
and/or taxation, entering a bad deal may shed light on the
taxpayer's true tax-avoidance motivation.  *Id*. ("the absence
of reasonableness sheds light on Long Term's subjective
motivation, particularly given the high level of
sophistication possessed by Long Term's principals in matters
economic.").  Similarly, a conspicuous lack of concern over
the particulars of the transaction by the taxpayer may be
evidence that the transaction is a sham.  *See, Mahoney v.
Commissioner*, 808 F.2d 1219, 1220 (6th Cir. 1987).

### 2.   The Transactions At Issue Lack Economic Substance

The presence or lack of economic substance for federal
tax purposes is determined by a fact-specific inquiry on a
case-by-case basis.  *Frank Lyon*, 435 U.S. at 584.  In this
case, the Court finds that the evidence demonstrates that the
transactions at issue do not have economic substance because
Thomas and Fox received no economic benefit, other than the
increase in basis, from the transactions.  In addition, the
Court finds that the evidence demonstrates that Thomas and

1  Fox were motivated by this increased basis and not by any

2  purported "hedging" benefit.

3       Plaintiffs argue that factual differences between this

4  case and the recent economic substance cases of *Stobie Creek*

5  and *Jade Trading* mean that the transactions at issue in this

6  case do, in fact, have economic substance.  However, an

7  examination of how the economic substance analysis was

8  applied in *Stobie Creek* and *Jade Trading* demonstrate that the

9  transaction at issue in this case, like the transactions in

10 those cases, do not have economic substance.

11          **a.   Under the Economic Substance Analysis as**

12               **Applied in *Stobie Creek*, The Transactions**

13               **At Issue in This Case Lack Economic**

14               **Substance**

15      *Stobie Creek* involved the contribution of offsetting long

16 and short foreign-currency options to single-member LLCs.

17 The plaintiffs in *Stobie Creek* alleged that the principal

18 involved was a "reasonable investor" who "made a reasonable

19 assessment regarding profitability."  *Id*. at 693.  In

20 evaluating this claim, the court stated that it could not

21 "ignore the functional and historical reality that the

22 [offsetting option pairs] were part of the prepackaged J&G

23 strategy marketed to shelter taxable gains."  *Id.*  In

24 addition, the Court in *Stobie Creek* relied heavily on the

25 expert testimony offered by the Government in concluding that

26 "plaintiffs' attempts to establish a legitimate profit motive

27 wither against the devastating, much more credible expert

28 testimony that established the objective economic reality

that the [offsetting option pairs] were severely over-priced,
had a negative expected-rate-of-return, and consequently had
a scant profit potential." *Stobie Creek*, 823 Fed. Cl. At
696.  The Government's expert concluded that the transaction
"was priced at levels that far exceeded [the components']
theoretical value[,]" where those values were computed using
an adaptation of the Black-Scholes model.  *Id.* At 685.

     The court dismissed the plaintiffs' expert's criticism of
the Government's expert's reliance on the Black-Scholes
model.  While the court recognized the validity of the
criticism that "the model involves assumptions of perfect and
static markets[,]" it found that the plaintiffs' expert
"could not offer a more appropriate substitute." *Id.* at 689-
90.  The court concluded that the expert testimony "suggests
that no reasonable and prudent investor would have expected a
possibility of a profit on these transactions." *Id.* at 693.

     In evaluating the subjective business purpose prong of
the economic substance analysis, the court rejected the
testimony of the principal that he "believed a 30% chance of
doubling his investment existed" because the court found that
"the [offsetting option pairs] had no objectively reasonable
possibility of returning a profit and therefore lacked an
objective business purpose." *Id.* at 698.  The court found
that the transactions were "integral to a 'preconceived' tax
shelter scheme that was not structured to create a viable
profit-producing investment, but, rather, to inflate the
basis in an unrelated asset that would yield large capital
gains upon sale." *Id.*  Moreover, the court found that while

there was "limited evidence" of an investment motive, the
evidence was "not sufficient to overcome the evidence that
the [offsetting option pairs] were economic nullities beyond
producing the claimed tax benefits." *Id.*

Similarly, in this case, Defendant's expert, Professor
Grendier, used recognized option-pricing-modeling techniques
to conclude that the value of the Thomas transaction was
$574, and the value of the Fox transaction was $259.[7]
Therefore, based on a thirty-five percent volatility, Thomas
and Fox paid approximately 2,700 and 2,600 times the value of
the transactions they purchased.

Although Plaintiffs' experts, Professors Manaster and
Edelstein, criticized Professor Grendier's Black-Scholes
method, Professor Manaster testified that, in the absence of
comparative prices, he would have performed the same analysis
while Professor Edelstein offered no acceptable alternative
to Professor Grenadier's analysis.

Moreover, like the transaction in *Stobie Creek*, the call
option spread was a prepackaged deal offered by Arthur
Andersen that focused on the creation of basis.  Arthur
Andersen did not offer any advice on whether the transaction
was a hedge, and Mandel, who offered the call option spread
to Thomas and Fox, had no expertise on hedging or options.

Finally, there is no credible evidence that the
transactions performed as hedges.  First, there is no

---

[7]  Professor Grenadier used a thirty-five percent implied
volatility, which is validated by the implied volatility of
the Bank of America and JP Morgan quotes Plaintiffs received
for similar transactions.

credible evidence that a close correlation exists between the
value of the broad-based REIT basket and the value of any of
Thomas's and Fox's real estate investments.  Second, even if
the transactions served as hedges, the price paid by Thomas
and Fox vastly exceeded any benefit they could have received.
In addition, despite claiming to follow the REIT market
closely, Fox did not know the difference between the average
drop required to produce a return of one dollar on his
transaction, and the historical drop that occurred in 1974.
Therefore, as in *Stobie Creek*, the Court does not find that
the self-serving testimony of the principals, Thomas and Fox,
sufficient to overcome the substantial and objective evidence
that the transactions at issue are economic nullities entered
into for the purpose of fabricating tax basis in amounts that
are vastly disproportionate to the actual cost.

        **b.**    **Under the Economic Substance Analysis as
Applied in *Jade Trading*, The Transactions
At Issue in This Case Lack Economic
Substance**

*Jade Trading*, another recent case involving economic
substance analysis, involved the contribution of a long
option and a short option to a partnership.  *Jade Trading*, 80
Fed. Cl. at 11-13.  The three taxpayers each paid $150,002,
and each obtained an increased basis of $15 million.  *Id.*
The court disallowed the claimed tax benefits and determined
that the transaction was an economic sham.  *Id.* at 14.  The
court reached its conclusion based on five reasons.  First,
the claimed losses "were purely fictional" because the

taxpayers "did not invest $15 million in the spread and did not lose $15 million when exiting Jade without exercising either option."  Second, the plaintiffs contentions that the transaction had a profit potential was contradicted by the large limitation on the maximum net profit that could be earned and the "large and unusual" fees that the plaintiffs paid.  Third, the transaction was "devised and marketed by a tax accounting group . . .as a tax product, not by an investment advisor as a vehicle to earn a profit," and, thus, the court found it "was developed as a tax avoidance mechanism and not an investment strategy."  Fourth, the initiation of the transaction outside the partnership followed by the contribution to the partnership "had no effect whatsoever on the investment's value, quality, or profitability, except to add cost and burden," but "packaging the investment in the partnership vehicle was an absolute necessity for securing the tax benefits."  Fifth, there was a "highly disproportionate tax advantage to the underlying monetary outlay – the tax loss per [taxpayer], $14.9 million, was roughly 65 times greater than each LLC's $225,002 financial commitment to Jade, almost 100 times each LLC's $150,002 investment in the spread transaction which generated the loss, and approximately 100 times the $140,000 potential net profit each LLC could have earned."

Similarly, the Court finds that consideration of these same five reasons in this case leads to the same result – that the transactions at issue in this case lack economic substance.  First, the claimed basis is fictional, because

1   Thomas and Fox paid only $1.5 million and $675,000,

2   respectively for the integrated transactions they purchased,

3   but gained an increased basis of $101,500,000 and

4   $45,675,000, respectively.  The increase in basis is

5   approximately sixty-seven times what they paid for the

6   transactions.  Second, as Professor Grenadier explained,

7   there is virtually no likelihood of a thirty percent average

8   drop over ninety days – the drop required to yield a one

9   dollar return – much less the average fifty percent drop

10  required to yield the maximum payout possible.[8]  Third, the

11  design of the call option spread demonstrates that it was

12  designed for the creation of tax benefits.  Mandel, who was

13  intimately familiar with the call option spread transaction

14  format and was integral in selling these transactions to

15  Thomas and Fox, was a tax expert specializing in "leading

16  edge tax solutions," not an options or risk-management

17  expert.  Moreover, there is no evidence that the call option

18

19      [8]   In post-trial filings in January 2009, Plaintiffs ask
the Court to take judicial notice of the fact that had

20  options with identical terms been purchased on October 1,
2008, there would have been a payoff.  In fact, Plaintiffs

21  allege that the actual drop in the REIT basket for the
ninety-day period from October 1, 2008 to December 29, 2008,

22  using Asian-style options was 43.47 percent.  Defendant does
not dispute that this information is accurate, but asserts

23  that it is irrelevant because Defendant did not argue that a
payoff from the transactions as issue was "impossible", but

24  merely "extremely low" and, thus, any economic substance from
the transactions at issue was de minimis.  The Court agrees

25  with Defendant that the fact that Plaintiffs are able to
demonstrate one instance of an Asian-style European option

26  drop in the nearly fifty-year history of REITs occurring
seven years after the transactions in question does not

27  change the Court's conclusion that a payoff from the
transactions at issue was, at best, highly unlikely.  In

28  addition, the Court's conclusion that the transaction at
issue lack economic substance is based on, as explained
above, a variety of other factors.

spread was designed as a hedge generally, or that it operated
as a hedge with respect to the transactions at issue in this
case.  Fourth, there is no evidence that the contribution to
the partnerships, which was part of the design of the
prepackaged transactions, had any effect "on the investment's
value, quality, or profitability."  However, the contribution
was required for the creation of an increased basis.  In
addition, in the weeks after Mandel first discussed the call
option spread with Thomas and Fox, Griffiths provided tax
advice to them about the increased basis they would achieve
if they purchased the transactions.  Fifth, the tax benefit
is highly disproportional – sixty-seven times – to the actual
economic outlay.  As a result the Court finds that the
transactions at issue lack economic substance.

### c.   The Transactions At Issue In This Case Are Economic Shams.

In this case, it is clear that Plaintiffs are not
taxpayers "who structured their transactions and ordered
their affairs in a way so as to reduce their liability for
taxes or to achieve the greatest tax benefits; rather, the
tax benefits shaped the structure of the investment in order
to achieve the goal of tax avoidance." *Stobie Creek*, 82 Fed.
Cl. at 698; *see, also, Coltec*, 454 F.3d at 1357 ("there is a
material difference between structuring a real transaction in
a particular way to provide a tax benefit (which is
legitimate), and creating a transaction, without a business
purpose, in order to create a tax benefit (which is
illegitimate).").  Because of the mismatch between the

purported purpose of "hedging" and the inability of the Asian-style options to satisfy that purpose, the dramatic overpayment by Thomas and Fox for the *de minimis* value they received in return, and the virtual impossibility of receiving even one dollar in return versus the certain increase in basis by $101,500,000 Thomas and 445,675,000 by Fox, the Court finds that the only appreciable benefit gained by the transactions at issue was an increased basis.  This conclusion is supported by the fact that Thomas and Fox were sophisticated economic actors.  In fact, Thomas was a former trial attorney with the IRS.  Thomas and Fox, along with Griffiths, their tax advisor, obviously recognized the value that would result from the increased basis, such as shielding distributions of cash and property from their partnerships by characterizing that property as a return on capital, or reducing the obligation to restore a negative capital account on termination of their partnerships.

    The Court finds that the weight of evidence, including the persuasive expert testimony by Professor Grenadier, established that the transactions at issue did not appreciably improve the economic position of Thomas and Fox beyond the creation of an increased basis.  Any subjective belief by Thomas and Fox that the transaction constituted a hedge was not objectively supported by the evidence, and any subjective belief that there was an economic benefit is not objectively reasonable.  No prudent business person, such as Thomas or Fox, would pay between 2,600 and 2,700 times the value of the transactions in this case for this type of a

hedge.  Because the transactions do not provide any
appreciable economic benefit to Thomas or Fox, the Court
finds that the transactions at issue are economic shams, and
any evidence of a non-tax avoidance subjective motivation is
not sufficient to give the transactions economic substance.
Therefore, the transactions must be disregarded under the
prevailing economic substance doctrine, and are without
effect for purposes of federal taxation.

**B.    Application of the Step Transaction Doctrine Yields
        a Cost-Basis of $1.5 Million for Thomas and $675,000
        for Fox.**

As an alternative to the economic substance doctrine,
Defendant also seeks to invalidate the tax effects claimed by
Plaintiffs under the step transaction doctrine.  "The Supreme
Court has expressly sanctioned the step transaction doctrine,
noting that 'interrelated yet formally distinct steps in an
integrated transaction may not be considered independently of
the overall transaction.'"  *The Falconwood Corp. v. United
States*, 422 F.3d 1339, 1349 (2005) (quoting *Comm'r v. Clark*,
489 U.S. 726, 738 (1989)).  "[T]he objective of the doctrine
is to 'give tax effect to the substance, as opposed to the
form of a transaction, by ignoring for tax purposes, steps of
an integrated transaction that separately are without
substance.'"  *Id*. (quoting *Dietzsch v. United States*, 204
Ct.Cl. 535, 498 F.2d 1344, 1346 (1974)).

Courts principally rely on two tests to determine whether
to apply the step-transaction doctrine: the interdependence

test and the end result test.   *See, Kornfield v.*

*Commissioner*, 137 F.3d 1231, 1235 (10th Cir. 1998); *Brown v.*

*United States*, 782 F.2d 559, 563-64 (6th Cir. 1986); *Security*

*Indus. Ins. Co. v. United States*,  702 F.2d 1234, 1244 (5th

Cir. 1983); *McDonald's Rests. v. Commissioner*, 688 F.2d 520,

524-25 (7th Cir. 1982).   While the two tests have different

formulations, both tests have as their central purpose the

implementation of "the central purpose of the step

transaction doctrine; that is, to assure that tax

consequences turn on the substance of a transaction rather

than on its form."   *King*, 418 F.2d at 517.

### 1.   The End-Result Test

    The end-result test applies when "a series of separate

transactions were prearranged parts of what was a single

transaction, cast from the outset to achieve the ultimate

result." *Greene v. United States*, 13 F.3d 577, 583 (2d Cir.

1994)(*citing Penrod v. Commissioner*, 88 T.C. 1415, 1429 (T.C.

1987).  "[p]urportedly separate transactions will be

amalgamated into a single transaction when it appears that

they were really component parts of a single transaction

intended from the outset to be taken for the purpose of

reaching the ultimate result." *Brown*, 782 F.2d at 564

(*quoting King*, 418 F.2d at 516).   While the taxpayer's intent

is relevant under the end-result test, it is not the intent

to avoid taxes; instead, it is whether the taxpayer intended

to achieve a particular end-result, legitimate or not,

through a series of interrelated steps. *True*, 190 F.3d at

1175.   Thus, if a taxpayer structures a single transaction in

1   a certain way that involves multiple steps, "he cannot

2   request independent tax recognition of the individual steps

3   unless he shows that at the time he engaged in the individual

4   step, its result was the intended end result in and of

5   itself." *Id.* at 1175 fn. 9.

6        In this case, both Thomas and Fox contend that the reason

7   they engaged in the transactions at issue was to "hedge"

8   against a catastrophic collapse in the real-estate market.

9   Thus, as they described it, Thomas and Fox essentially placed

10  a "bet" that they now contend amounted to a hedge.

11  Therefore, the long option, the short option, and the

12  promissory note are simply the "interrelated steps" through

13  which Thomas and Fox accomplish this "bet" or "hedge."  Under

14  the end results test, these interrelated steps of the

15  transaction should be collapsed into a unified whole and the

16  tax consequences determined accordingly.

17       In addition, any attempt by Plaintiffs to argue that they

18  had a valid business purposes, such as the plaintiff in the

19  *Falconwood* case, in engaging in the transactions at issue

20  does not "immunize" these transactions from the step

21  transaction doctrine.  *See, Stobie Creek*, 82 Fed. Cl. at 701.

22  While the court in *Falconwood* held that the step transaction

23  doctrine did not apply to the series of transactions at

24  issue, it did so because the taxpayer had an independent

25  business purpose for the initial step, and then was bound by

26  regulation to follow the remaining steps that the Government

27  had sought to collapse.  *Falconwood*, 422 F.2d at 1351-52

28  ("Upon completing a downstream merger for independent

1   business reasons, Falconwood therefore had little choice in

2   the face of quasi-legislative mandates but to file a final

3   consolidated tax return for the group that covered

4   Falconwood's operations for its entire taxable year.").

5   However, as in *Stobie Creek,* Plaintiffs "cannot align

6   themselves with the factual circumstances presented in

7   *Falconwood*" because they "were not bound by any legislative

8   or regulatory mandate to proceed along the tortuous steps

9   that resulted in the claimed basis enhancement." *Stobie*

10   *Creek*, 82 Fed. Cl. at 702.

11           **2.   The Interdependence Test**

12       "The interdependence formulation of the step transaction

13   doctrine requires an inquiry into whether the individual

14   transactions in the series would be "fruitless" without

15   completion of the series." *Id.* at 699 (*quoting Falconwood*,

16   422 F.3d at 1349).  Under this test, courts analyze whether

17   or not one part of the overall transaction would have

18   occurred without another part. *Kornfield*, 137 F.3d at 1235;

19   *Security Indus. Ins.*, 702 F.2d at 1247.  If not, the

20   transaction is then integrated and the step transaction

21   applies. *Id.*  Thus, under this test, courts "disregard the

22   tax effects of individual transactional steps if "it is

23   unlikely that any one step would have been undertaken except

24   in contemplation of the other integrating acts." *True*, 190

25   F.3d at 1175 (*citing Kuper v. Commissioner*, 533 F.2d 152, 156

26   (5th Cir. 1976)).

27       In this case, the components of the transactions at issue

28   were interdependent because each component was required to

accomplish the desired economic result, which was, as
Plaintiffs describe it a "bet" or "hedge" against a collapse
in the real estate market.   This is best demonstrated by the
fact that the documents executed as part of the transactions
created interlocking contractual obligations.   For example,
the Certificate re: Consent and Authorization discusses a
"Master Transaction."   The Master Transaction "would be
effectuated through the execution and delivery by the Trust
of the  following agreements: (a) Master Agreement to be
entered into by . . . the Trust and [AIG] . . .; (b) Note . .
., to be entered into by and between the Trust and [AIG]. .
.; (c) Pledge Agreement by and between Trust and [AIG]; (d)
Option and Equity Derivative Account Agreement by and between
Trust and [AIG], and (e) Confirmation Letter Agreements re:
share option transaction I and re: share option transaction
II to Trust from [AIG]."   Moreover, the Master Agreement
specifies that all transactions and confirmations constitute
a single agreement.

     The creation of these interlocking obligations with
respect to the long option, the short option, and the note
accomplished the goal of creating the "bet" sought by Thomas
and Fox.   Neither the long or short option independently
could have created the required "bet."   For example, Thomas
and Fox would have only benefitted from an independent
purchase of the long option if prices of the stocks in the
REIT basket increased, which is the opposite of what they
were trying to accomplish in "hedging" against a drastic
downturn in the real estate market.   In addition, an

independent purchase of the short option would have exposed
Thomas and Fox to unlimited losses if the price of the stocks
in the REIT basket increased.   Thus, the purchase of the long
option, the short option, and the AIG note were required to
accomplish the desired "hedge."   Therefore, the transactions
making up the steps of the "hedge" strategy pursued by the
Plaintiffs "are interdependent and have no independent
functional justification outside of the series." *Stobie
Creek,* 82 Fed. Cl. at 700.   "Under the interdependence test,
the individual steps must be disregarded and collapsed into a
single transaction." *Id.*

The Court finds that, under either the interdependence
test or the end result test, the step transaction doctrine
applies to Plaintiffs' transactions. *Id.* Accordingly, the
tax consequences should be determined on the substance of the
transactions at issue, and not on the form used by
Plaintiffs. *Id.*

**C.   Application of the Substance Over Form Doctrine
Yields a Cost-Basis of $1.5 Million for Thomas and
$675,000 for Fox.**

In 1945, the Supreme Court stated: "The incident of
taxation depends on substance rather than form of the
transaction." *Commissioner v. Court Holding Co.,* 324 U.S.
331, 334 (1945); *see, also, True v. United States*, 190 F.3d
at 1174 (10th Cir. 1999); *Allen v. Commissioner*, 925 F.2d 348,
352 (9th Cir. 1991).   In applying this principle, a court
"must look beyond the taxpayers' characterization of

isolated, individual transaction steps, and also review the substance of each series of transactions in its entirety." *True*, 190 F.3d at 1174.  Thus, taxpayers may not characterize a transaction solely based on the labels they have used, because such an approach "would completely thwart the Congressional policy to tax transactional realities rather than verbal labels." *Crenshaw v. United States*, 450 F.2d 472, 477-78 (5th Cir. 1971).  Therefore, it is the "true nature" of the transaction, not its "mere formalisms" that control.  *Court Holding*, 324 U.S. at 334; *see, also, Allen*, 925 F.3d at 352; *True*, 190 F.3d at 1174.

The countervailing consideration to application of the substance over form doctrine is the principle that taxpayers may generally structure their transactions as they wish. *Brown v. United States*, 329 F.3d 664, 671 (9th Cir. 2003). Thus, courts do not invalidate claimed tax benefits if the form of the transaction yields tax benefits which are consistent with Congressional intent as to the particular Internal Revenue Code provisions at issue.  *Id.* at 672. Therefore, courts must make a fact-specific inquiry to determine if the facts fall within the intended scope of the applicable statute.  *Stewart v. Commissioner*, 714 F.2d 977, 988 (9th Cir. 1983).

In this case, Thomas and Fox entered into the transactions at issue, which they described as "bets" or "hedges" against a collapse in the real estate market. Thomas contends that he "paid approximately $1,500,000 to take a chance that he could receive up to $38,400,000."

According to Thomas, "[t]he $1.5 million is, in effect, the TDP transaction cost, the cost of inducing Banque AIG to make a bet on real estate values. Similarly, Fox contends he "paid approximately $675,000 to take a chance that he could receive up to $17,242,574." According to Fox, "[t]he $675,000 is, in effect, the Fox transaction cost, the cost of inducing Banque AIG to make a bet on real estate values."

Once these initial payments of $1.5 million and $675,000 were made, Thomas and Fox had no downside exposure from their "bets," and only an extremely remote possibility of receiving a return. These contractually interlocking transactions were carefully structured so that the amount payable under the short option would never exceed the amounts to be received from the long option and the AIG note. The assets – the long option and the note – were pledged to AIG to secure the liability created by the short option.

For purposes of the application of the form over substance doctrine, the substance of the transaction is clearly a net payment of $1.5 million by Thomas and $675,000 by Fox for a possible payout with no downside exposure. Therefore, Thomas's true economic cost is $1.5 million, not $101.5 million. Similarly, Fox's true economic cost is $675,000, not $45,675,000.

Because the basis of property is its cost per I.R.C. § 1012, and because Thomas's economic cost for the entire transaction was $1.5 million, his basis was $1.5 million. Thomas's partnerships succeeded to that basis. Similarly, because Fox's economic cost for the entire transaction was

1   $675,000, his basis was $675,000.  HFI succeeded to that
2   basis, while MP-MI and TMI succeeded to their proportional
3   share of that basis.  The partnerships' characterization of
4   the contribution at more than sixty times what Thomas and Fox
5   actually paid for their unified position is plainly
6   inconsistent with the fundamental principle that basis equals
7   cost as expressed by Congress in I.R.C. § 1012.  Accordingly,
8   under the substance over form doctrine, the tax consequences
9   should be determined on the substance of the transactions at
10  issue, and not on the form used by Plaintiffs.

11

12      **D.   Even if the Transactions At Issue Have Economic**
13           **Substance and the Step-Transaction and Form Over**
14           **Substance Doctrines Do Not Apply, the Obligation**
15           **Created by the Short Option is a Liability for**
16           **Purposes of I.R.C. § 752.**

17      When a partner contributes property to a partnership, the
18  partnership succeeds to the contributing partner's basis in
19  the property under I.R.C. § 723.  In addition, the
20  contributing partner increases his basis in the partnership
21  by his cost basis in the property under I.R.C. § 722.

22      On the other hand, when a partnership assumes a liability
23  of a partner, the partner's basis in his partnership interest
24  is: (1) decreased by the amount of the liability; and (2)
25  increased by the partner's share of the partnership liability
26  resulting from the assumption of the liability.  I.R.C. §§
27  722, 733(1), and 752(a) and (b).  Once the liability is
28  satisfied, the partner's basis in his partnership interest is

1  decreased by the amount of the liability.  I.R.C. §§ 733(1)
2  and 752(b).

3      In this case, Plaintiffs argue that the short option was
4  not a liability for purposes of Section 752.  Therefore, for
5  example, Thomas argues that the $101.5 million increase in
6  basis that he received when he contributed the long option
7  and the AIG note should not be reduced to account for the
8  offsetting $100 million short option.  However, as explained
9  above, when the liability is satisfied, Thomas's basis should
10 be reduced by $100 million pursuant to Section 752.
11 Therefore, the increase in Thomas's basis would be merely
12 $1.5 million, or the equivalent of Thomas's net payment for
13 the transaction.  Thus, the characterization of the
14 partnership's short option as a liability for purposes of
15 Section 752 is consistent with the cost basis – and the
16 economic reality – of Thomas's contribution.  *See*, I.R.C. §
17 1012.

18     The above interpretation of Section 752 is consistent
19 with Revenue Ruling 88-77, where the I.R.S. determined that
20 when an obligation creates or increases the basis of the
21 obligor's assets, the obligation is a "liability" for the
22 purposes of Section 752.  In Revenue Ruling 88-77, the I.R.S.
23 defined liability for purposes of Section 752 to "include an
24 obligation only if and to the extent that incurring the
25 liability creates or increases the basis to the partnership
26 of any of the partnership's assets (including cash
27 attributable to borrowings)."

28

1    In this case, the short option, the long option, and the
2  AIG note were contractually interlocked, and the acquisition
3  of the obligation (the short option) clearly created basis
4  (via the long option and the note) and should be recognized
5  as a liability for purposes of Section 752.  In fact, the
6  long option and the AIG note were purchased with the proceeds
7  of the sale of the short option.

8    The above interpretation of Revenue Ruling 88-77 is
9  consistent with the Fifth Circuit's interpretation in *Korman*
10 *& Associates, Inc., v. United States*, 527 F.3d 443 (5th Cir.
11 2008), and the Court of Federal Claim's recent interpretation
12 in *Marriott International Resorts, L.P., v. United States*, 83
13 Fed. Cl. 291 (2008).[9]  At the time of the transactions at
14 issue in this case and prior to the Fifth Circuit's decision
15 in *Korman*, the *Helmer* line of cases found that certain
16 liabilities assumed by partnerships should not be recognized
17 for basis purposes because they were too indefinable or
18 "contingent."  *See, Helmer v. Commissioner*, T.C. Memo. 1975-
19 160 (1975); *see, also, Long v. Commissioner*, 71 T.C. 1
20 (1978), *and La Rue v. Commissioner*, 90 T.C. 465 (1988).

21    For example, in *Helmer*, a corporation held a purchase
22 option on real estate owned by a partnership, and made
23 periodic payments to maintain the option.  T.C. Memo. 1975-

24
25    [9]   The recent Court of Federal Claims case of *Marriott International Resorts*, relied on Revenue Ruling 88-77 to determine that the obligation created by a short sale was a
26 liability for purposes of I.R.C. § 752.  *Marriott International Resorts, L.P. v. United States*, 83 Fed. Cl. 291
27 (2008) (finding that, in light of the promulgation of Revenue Ruling 88-77, symmetrical treatment that "would call for
28 recognition of the corresponding obligation to replace the borrowed securities" was required under Section 752).

160 (1975).  Because the partnership was obligated to apply the option payments to the purchase price if the corporation exercised its option, the partners argued that its receipt of these payments created a partnership liability that increased their basis in the partnership.  *Id.*  However, the Tax Court found that the payments "created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future."[10]  *Id.*

However, in *Korman*, the Fifth Circuit addressed the question whether the assumption of a liability from a short sale of Treasury notes is a liability under Section 752, and determined that it was a Section 752 liability because the assumption was accompanied by the contribution of the proceeds from the short sale.  In *Korman,* the taxpayer borrowed $100 million in Treasury bills and sold them for $102.5 million.  The taxpayer then contributed the $102.5 million to a partnership, and the partnership assumed the liability for covering the short sale.  The taxpayer then conveyed the partnership interest to another partnership, which sold the interest for $1.8 million.  The taxpayer claimed a loss of $100 million, and ignored the liability

---

[10]  That the option holder in *Helmer* was able to exercise his option or not is a key distinction between *Helmer*, and its progeny, and this case where the funds received from the sale of the short option are used to purchase the long option and the AIG note, and the proceeds of which are pledged to secure the liability created by the short option.  *Helmer* and its progeny also are distinguishable from this case because they did not involve the assumption of a payment obligation by a partnership from a partner.

1   created by the obligation to cover the short sale because it

2   was "contingent."[11]

3        The Fifth Circuit noted that the taxpayer acknowledged

4   "only suffer[ing] a $200,000 economic loss" but "claim[ing] a

5   $102.6 [m]illion tax loss on its return." *Id.* at 456.  The

6   Fifth Circuit found the taxpayer was making a "premeditated

7   attempt to transform this wash transaction (for economic

8   purposes) into a windfall (for tax purposes)" that was

9   "reminiscent of an alchemist's attempt to transmute lead into

10  gold." *Id.*

11       In this case, as in *Kornman*, Plaintiffs are seeking to

12  "treat[] [their] contingent assets and . . . contingent

13  liabilities asymmetrically." *Id.* at 460 (internal citation

14  omitted).  Moreover, the proceeds from the initial short sale

15  and the subsequent covering transaction in this case are

16  "inextricably intertwined." *Id.* at 460-61.  Therefore, to

17  apply the *Helmer* line of cases to this case would, as the

18  *Korman* court found, "fl[y] in the face of reality" and result

19  in an "unwarranted aberration." *Id.* at 461.

20

21

22

23

24

_____

25

26       [11]   However, as the Fifth Circuit found, "[t]he Internal
    Revenue Code deals with dollars, and the basis adjustment
27  provisions of section 752 presume that the value of the
    liability is ascertainable." *Korman,* 527 F.3d at 452.

28

1      **E.    Even if the Short Option is Not an I.R.C. § 752**

2             **Liability, the Obligation Created by the Short**

3             **Option Must Still be Taken into Account under**

4             **Treasury Regulation § 1.752-6.**

5      Section 1.752-6 of the Treasury Regulations applies to a

6 partnership's assumption of liability occurring after October

7 18, 1999, and before June 24, 2003, if I.R.C. § 752(a) and

8 (b) do not apply to that liability.[12]  26 C.F.R. 1.752-6.  On

9 June 24, 2003, the Treasury Department proposed regulations,

10 including temporary Treasury Regulation § 1.752-6, that would

11 define "liability" in the partnership context under I.R.C. §

12 752, and which relied on the interpretation of "liability"

13 found in I.R.C. § 358(h)(3)[13] and Revenue Ruling 88-77.  *See,*

14 *Assumption of Partner Liabilities*, 68 Fed.Reg. 37,434 (June

15 24, 2003) (Prop. Treas. Reg. §§ 1.752-0 to -7).  These

16 temporary regulations became final on May 26, 2005, and the

17 Treasury Department specified that Treasury Regulation §

18 1.752-6 would apply retroactively.  *See,* 70 Fed.Reg. 30,334,

19 30,335 (May 26, 2005). Treasury Regulation § 1.752-6 was

20 adopted by Congressional directive pursuant to Section 309 of

21 the Community Renewal Tax Relief Act of 2000 ("2000 Act"),

22 which added Section 358(h) to the I.R.C., and which defines

23

24     [12]  Section 1.752-7 applies to assumptions of liability occurring after June 24, 2003, and taxpayers could elect to

25 apply it to assumptions of liability occurring between October 18, 1999, and June 24, 2003.  Treas. Reg. § 1.752-7(k).

26

27     [13]  Section 358(h)(3), which defines "liability" in the context of determining basis on corporate transactions as

28 including "any fixed or contingent obligation to make payment."

"liability" as including contingent obligations for purposes
of certain corporate stock exchanges.  Section 309(c)(1) of
the 2000 Act required the Secretary of the Treasury to adopt
comparable rules for transactions involving partnerships, and
expressly authorized retroactivity of those rules by stating
that the Treasury Regulations adopted under Section 309(c)
"shall apply to assumption of liabilities after October 18,
1999, or such later date as may be prescribed in such rules."

     If Treasury Regulation § 1.752-6 is applied retroactively
in this case, the short options at issue would constitute
liabilities for purposes of I.R.C. § 752, and, thus, would
require a reduction in the partnership basis claimed by
Plaintiffs.

     Plaintiffs argue that, as the court in *Stobie Creek*
recently found, the requirement under Section 1.752-6 that a
partner's basis in a partnership interest must be reduced by
the value of the contingent liabilities assumed by the
partnership is "contrary to the then existing policy to
exclude contingent liabilities from the computation of
partnership basis." *Stobie Creek Investments, LLC v. United
States*, 82 Fed. Cl. 636, 668 (2008) (citing *Helmer*, 34 T.C.M.
(CCH) 727 (1975)).  Both Plaintiffs and the court in *Stobie
Creek* base the conclusion that Section 1.752-6 represented a
change from previous policy on the Treasury Department's
statement that "[t]he definition of a liability contained in
these proposed regulations [including Section 1.752-6] does
not follow *Helmer*." *Stobie Creek,* 82 Fed. Cl. At 668 (citing
68 Fed.Reg. at 37,436).

1    However, other courts have found that Treasury Regulation
2    § 1.752-6 does apply retroactively.  For example, in *Cemco*
3    the United States Court of Appeals for the Seventh Circuit
4    observed that Treasury Regulation § 1.752-6 was "explicit" in
5    stating that it applied retroactively to assumptions of
6    liabilities occurring before its enactment.  *Cemco Investors,*
7    *LLC v. U.S.*, 515 F.3d 749, 752 (7th Cir. 2008).  The *Cemco*
8    court relied on I.R.C. § 7805(b)(6) which specifically allows
9    retroactivity.[14]  *Cemco*, 515 F.3d at 752.  The *Cemco* court
10   found that the effect of Treasury Regulation § 1.752-6 was to
11   "instantiate the pre-existing norm that transactions with no
12   economic substance don't reduce people's taxes."  *Cemco*, 515
13   F.3d at 752.

14   This Court agrees with the *Cemco* court that Treasury
15   Regulation § 1.752-6 should be applied retroactively.  The
16   Court finds that the rationale of the First Circuit in *Stobie*
17   *Creek* and Plaintiffs with respect to Treasury Regulation §
18   1.752-6 "misrepresents the state of prior law" by
19   interpreting the statement that "[t]he definition of a
20   liability contained in these proposed regulations does not
21   follow *Helmer v. Commissioner*" as an indication that *Helmer*
22   represented the prevailing prior law.  Burke, Karen C. and
23   McCough, Gayson, M.P., *Cobra Strikes Back:  Anatomy of a Tax*
24   *Shelter* (June 19, 2008), at 33 and 39 n. 121.  In addition,
25   the Treasury Department also stated that "following the
26   principles set forth in § 1.752-1T(g) and Rev. Rul. 88-77,

27
28   [14]   Retroactivity is also permitted to prevent abuse
     pursuant to I.R.C. § 7805(b)(3).

the proposed regulations provide that an obligation is a liability if and to the extent that incurring the obligation: (A) Creates or increases the basis of any of the obligor's assets (including cash)."  68 Fed. Reg. 37434, 37437 (2003).

Recognizing that "[t]here is no statutory or regulatory definition of liabilities for purposes of section 752" (68 Fed. Reg. 37434, 37435 (2003)),  the Treasury Department relied upon Revenue Ruling 88-77 and *Salina Partnership v. Commissioner*, T.C. Memo 2000-352 (T.C. 2000), and concluded that "[c]ase law and revenue rulings, however have established that, as under section 357(c)(3), the terms liabilities for this purpose does not include liabilities the payment of which would give rise to a deduction, unless the incurrence of the liability resulted in the creation of, or increase in, the basis of property."  68 Fed. Reg. 37334, 37435 (2003).  Thus, the Treasury Department found that "[t]he question of what constitutes a liability for purposes of section 752 was addressed in Revenue Ruling 88-77," and that the definition of liability in Revenue Ruling 88-77 was consistent with the Internal Revenue's position in Revenue Ruling 95-26.  *Id.* at 37436.  Therefore, the Treasury Department simply applied the pre-existing rule contained in Revenue Ruling 88-77 to address the possibility of abuse caused by contingent liabilities not being recognized under I.R.C. § 752.[15]

---

[15]   Treasury Regulation § 1.752-6 also incorporates the definition of liability contained in I.R.C. § 358(h)(3), which defines "liability" to include contingent liabilities.

1      Moreover, Notice 2000-44 placed Plaintiffs on notice that
2  the transactions it described would be scrutinized and
3  penalized.  Because Notice 2000-44 was issued in August 2000,
4  and notified taxpayers that the contribution of paired long
5  and short options to partnerships in order to artificially
6  increase outside basis were abusive, and would not be
7  allowed, the Secretary's exclusion of these transactions from
8  the exceptions in Treas. Reg. § 1.752-6(b) should not have
9  been a surprise to sophisticated taxpayers such as Thomas and
10 Fox, and their advisor, Arthur Andersen tax partner
11 Griffiths.  Moreover, while Plaintiffs argue that Notice
12 2000-44 did not give them notice because the transactions at
13 issue are not identical to those described in Notice 2000-44,
14 Plaintiffs conveniently ignore the "substantially similar"
15 language contained in the Notice.  Accordingly, the Court
16 finds that even if the short options at issue in this case
17 are not liabilities under I.R.C. § 752, the obligations
18 created by the short options still must be taken into account
19 under Treasury Regulation § 1.752-6.

20

21      **F.   The Accuracy-Related Penalties on the Ground of**
22          **Negligence or Disregarding the Rules or Regulations**
23          **is Appropriate Under I.R.C. § 6662.**

24      Section 6662 of the Internal Revenue Code governs
25 accuracy-related penalties.  The purpose of penalties is "to
26 deter taxpayers from playing the 'audit lottery,' that is,
27 taking undisclosed questionable reporting positions and
28 gambling that they [will] not be audited.  *Caulfield v.*

*Commissioner*, 33 F.3d 991, 994 (8th Cir. 1994).  As Plaintiffs have argued, Thomas and Fox have not yet used any of the tax benefits associated with the transactions at issue in this case.  Because this case is a partnership-level proceeding, the Court must determine "the applicability of any penalty . . . which relates to an adjustment to a partnership item."  I.R.C. § 6221.  However, the actual computation of the penalty in not done at the partnership level.

One of the accuracy-related penalties provided for in Section 6662 of the Internal Revenue Code is for negligence or disregard of rules or regulations.  I.R.C. § 6662(a) and (b)(1).  The Code defines negligence as "any failure to make a reasonable attempt to comply with the provisions" of the Code.  I.R.C. § 6662(c).  This is an objective standard requiring that the taxpayer exercise "due care."  *Hansen v. Commissioner*, 471 F.3d 1021, 1028 (9th Cir. 2006) (*citing Collins v. Commissioner*, 857 F.2d 1383, 1386 (9th Cir. 1988)).  Due care exists where the taxpayer "acted as a reasonable and prudent person would act under similar circumstances."  *Id.*  Under the Treasury Regulations, negligence is "strongly indicated" where "a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."  Treas. Reg. § 1.6662-3(b)(1)(ii) (2002); *see also Hansen*, 471 F.3d at 1029. In the Ninth Circuit, negligence is determined by an analysis

of "both the underlying investment and the taxpayer's
position taken on the tax return." *Hansen*, 471 F.3d at 1029;
*see also Neonatology Associates, P.A. v. Commissioner*, 299
F.3d 221, 234 (3d Cir. 2002) (finding that a taxpayer
"proceeds at his own peril" when "presented with what would
appear to be a fabulous opportunity to avoid tax
obligations."); *Pasternak v. Commissioner*, 990 F.2d 893, 902
(6th Cir. 1993) (upholding negligence penalty where the "Tax
Court found that petitioners were aware that they were buying
a program primarily of 'window dressings' for tax benefits
and either negligently or intentionally disregarded the
law.").

   In this case, the Court finds that the facts support the
imposition of an accuracy-based penalty on the grounds of
negligence or disregard of the rules and regulations.
Specifically, the transactions were entered into over one
year after the IRS issued IRS Notice 2000-44 entitled "Tax
avoidance using artificially high basis," which alerted
taxpayers and their representatives that purported losses
arising from certain transactions designed to create
artificially high bases in partnership interests would be
disallowed.  In addition, the partnerships failed to
demonstrate any attempt to determine whether the transactions
would potentially be covered by Revenue Ruling 88-77.
Moreover, the partnerships failed to demonstrate that they
attempted to determine whether the transactions had any
economic substance.  Furthermore, the partnerships failed to
demonstrate that they sought and received disinterested and

objective tax advice because the tax advice that they did
receive came from Arthur Anderson, which also arranged the
transactions.  Based on these facts, the Court concludes that
any objective view of the transactions results in the
conclusion that they had no non-tax economic benefit.

In addition, the partnership returns reported the
valuation of the transaction at sixty-seven times their
proper value under either I.R.C. § 752 or the substance over
form or step-transaction analysis.  In that regard, the
Thomas partnerships reported an increase in its capital
account of $101,500,000, which is sixty-seven times the
actual economic outlay of $1.5 million that Thomas paid for
the transaction.  Any reasonable and prudent taxpayer would
consider the transaction "too good to be true."  Treas. Reg.
1.6662-3(b)(1)(ii) (2002).  Therefore, the Court finds that
the partnerships were negligent and disregarded the rules and
regulations for purposes of I.R.C. § 6662.  Id.

The reasonable cause and good faith defense is a fact and
circumstance test that focuses on the taxpayer's affirmative
actions to determine its correct tax liability: "[g]enerally,
the most important factor is the extent of the taxpayer's
effort to assess the taxpayer's proper tax liability."
Treas. Reg. § 1.6662-4(b).  The taxpayer's "experience,
knowledge, and education" may be taken into account.  *Id.*
Reliance on a tax advisor "does not necessarily demonstrate
reasonable cause and good faith."  *Id.*

In this case, the partnerships did not have reasonable
cause to disregard the liabilities created by the short

1  options in valuing the Arthur Andersen call option spreads

2  contributed to the partnerships.  The transactions were

3  entered into over one year after the IRS issued IRS Notice

4  2000-44 entitled "Tax avoidance using artificially high

5  basis."  This notice alerted taxpayers and their

6  representatives that purported losses arising from certain

7  transactions designed to create artificially high basis in

8  partnership interests would be disallowed.  In addition, the

9  partnerships have failed to provide evidence that they

10  diligently attempted to properly assess their proper tax

11  reporting.  The partnerships also have failed to demonstrate

12  any attempt to determine whether the transactions would

13  potentially be covered by Revenue Ruling 88-77.  Furthermore,

14  the partnerships have failed to demonstrate that they

15  attempted to determine whether the transactions had any

16  economic substance.  Finally, the partnerships have failed to

17  demonstrate that they sought and received disinterested and

18  objective tax advice because the tax advice that they did

19  receive came from Arthur Andersen, which also arranged the

20  transactions resulting in the increased basis that is at

21  issue in this case.  Therefore, the partnerships  have failed

22  to demonstrate that they acted in good faith as required by

23  the reasonable cause exception of I.R.C. § 6664(c)(1).

24

25                    **Conclusions of Law**

26    1.  The Court has original jurisdiction over the federal

27  claims asserted in this action pursuant to Section 6226 of

28  the Internal Revenue Code.  The Court's jurisdiction extends

to all items of the partnership for the period at issue. I.R.C. § 6226(f).  Contributions to partnerships and distributions from partnerships are partnership items. Treas. Reg. § 301.6231(a)(3)-1(a)(4)(I) and (ii).  The characterization of offsetting options when contributed to partnerships is a partnership item.  *See, Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 41-43 (Fed. Cl. 2007); *Nussdorf v. Comm'r*, 129 T.C. 30, 43-44 and n. 16 (2007).[16]

2.   Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. § 1391(b) because the alleged acts complained of occurred and are occurring in this district.

3.   In applying the economic substance analysis to the transactions at issue in this case, the Court concludes that the transactions at issue are economic shams for tax purposes.

4.   Application of the step-transaction doctrine, through either the end result test or interdependence test, yields a cost basis of $1.5 million for Thomas and $675,000 for Fox.

5.   Application of the substance over form doctrine yields a cost basis of $1.5 million for Thomas and $675,000 for Fox.

6.   The obligations created by the short options in the transactions at issue are liabilities for purposes of I.R.C. § 752.

---

[16]   The parties do not dispute the facts requisite to federal jurisdiction.

7.   The obligations created by the short options in the transactions at issue are liabilities for purposes of Treasury Regulation § 1.752-6.

8.   I.R.C. § 6221 requires that "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level."  I.R.C. § 6226(e) authorizes this Court to conduct partnership-level proceedings and determine "the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item," I.R.C. § 6226(f).  In this case, the Court concludes that the partnerships were negligent for purposes of IRC § 6662, and, therefore, accuracy-related penalties are applicable in this case.

Dated: December 11, 2009 _____

JOHN F. WALTER
UNITED STATES DISTRICT JUDGE